Filed 3/15/16  Steuber v. Steuber CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BRENT STEUBER, | B258199 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. NP008128) |
| v. | |
| MICHELLE D. STEUBER, as Cotrustee, etc., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Daniel S. Murphy, Judge.  Affirmed.

Hitchcock, Bowman & Schachter and Robert Schachter for Plaintiff and Appellant.

Bergkvist, Bergkvist & Carter and Richard J. Cowles for Defendants and Respondents.

_____

Appellant Brent Steuber (Brent)[1] appeals from a probate court judgment following trial, which includes numerous findings regarding three petitions for approval of accounting in the administration of the Bernard W. Steuber and Loretta M. Steuber Family Trust dated April 7, 1997 (the Trust). Appellant challenges four of the trial court's findings: (1) the determination that a third party was owed reasonable compensation for services rendered on behalf of the trust and the mathematical calculation used; (2) the determination that the successor trustees are not personally liable for any overpayment to the third party; (3) the determination that the Trust's attorneys were entitled to fees pertaining to certain litigation; and (4) the determination of the fair market value of certain property distributed to one of the successor trustees.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Bernard W. Steuber (Bernard) and Loretta M. Steuber (Loretta) were the original grantors and trustees of the Trust. They had four children—Michelle D. Steuber (Michelle), Bernard W. Steuber II (Bernard II), Timothy L. Steuber (Timothy), and Brent—who are the named beneficiaries of the Trust. Michelle and Bernard II, respondents herein, are the named successor trustees. Bernard died on February 12, 1999, and Loretta died on October 1, 1999.

At the time of Loretta's death, the trust included 17 parcels of vacant unimproved land, the Steuber family residence, a chiropractic office, and income properties occupied by various tenants.

For more than 13 years, Brian Bowes worked full time for the Trust, for which he was compensated nearly $600,000 from the Trust. He described himself at trial as a self-employed consultant.

Three accountings for the Trust have been filed: The first accounting was filed for the period of October 1999 through May 2002; the second accounting was for June 1,

---

[1] For ease of reference, we refer to the parties by their first names. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475, fn. 1.)

2002, through December 2004; and the third accounting was for January 1, 2005, through December 2011.  Brent filed objections to each accounting.

The matter proceeded to trial, as the trial court put it, "to resolve the accounting issues and all other issues concerning the trust."  The court eventually issued an 18-page amended statement of decision, and entered a judgment making 18 legal and factual findings.  This appeal by Brent followed.

## DISCUSSION

### I.  Inadequate Record

As an initial matter, we address the issue of the adequacy of the record on appeal. Brent's opening brief begins:  "This appeal arises from rulings of the trial court on Petitions for Approval of the First Account, Second Account and Third Account in the trust administration of [the Trust]."  These documents were apparently admitted as exhibits at trial, yet no exhibits were designated in the notice to prepare clerk's transcript. While Brent subsequently filed a motion to augment the record to include a copy of the Trust, we denied this motion.  Respondents' brief is premised almost entirely on the lack of an adequate appellate record.  It was not respondents' obligation to produce the documents on which Brent's appeal is based.

California Rules of Court, rule 8.224(a)(1), allows a party to file in the trial court (with a copy to this court) a notice designating any original exhibits that were admitted in evidence, refused or lodged in the trial court, within 10 days after the last respondent's brief is filed.  This party then has 20 days to transmit the exhibits to this court.  (Cal. Rules of Court, rule 8.224(b)(2).)  If this period expires, the party may apply to this court for permission to submit the exhibits.  (Cal. Rules of Court, rule 8.224(c).)  Respondents filed their brief on November 2, 2015.  Brent did not file his notice designating exhibits until November 20, 2015, which was more than 10 days after respondents' brief was filed.  Brent also did not transmit the exhibits to this court until January 13, 2016, which was well past expiration of the 20-day period, and he did not file an application for permission to submit exhibits.  Moreover, the exhibits we received do not contain a stamp

3

or other indication that they were the original exhibits admitted at trial. Under these circumstances, we do not treat the exhibits as part of the appellate record.

## II.  Standard of Review

The parties agree the standard of review is abuse of discretion. (*Estate of Beard* (1999) 71 Cal.App.4th 753, 780.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.) An appellant seeking reversal of a trial court discretionary ruling has a "'daunting task.'" (*Dreamweaver Andalusians, LLC v. Prudential Insurance Co. of America* (2015) 234 Cal.App.4th 1168, 1171.) "To succeed, the appellant must demonstrate that the ruling was arbitrary, capricious, whimsical, or exceeded the bounds of reason." (*Ibid.*)

## III.  Compensation to Brian Bowes

Brent contends the trial court (1) abused its discretion in finding that third party Brian Bowes was entitled to reasonable compensation for services he performed on behalf of the Trust when no detailed time sheets were produced, (2) made mathematical errors in calculating the amount of compensation of $329,000, and (3) erred in finding that the successor trustees were not liable for the overpayment to Mr. Bowes.

### A.  Reasonable Compensation

Brent argues that because respondents, as successor trustees, failed to produce any detailed time sheets of the work performed by Mr. Bowes for the Trust over 13 years, the trial court's finding that he was entitled to reasonable compensation was a "totally arbitrary and unsupported decision."

Brent argues that exhibits 1 and 2, which supposedly include a summary of Mr. Bowes's work for the Trust, are insufficient to support any compensation because they do not include details of the work performed, dates the work was performed, or the actual time spent on any specific task. He describes these exhibits as "summary charts, which were created about two (2) years ago, with extremely vague and non-detailed statements of general work," with each summary being "nearly identical." As noted

4

above, we do not consider these exhibits to be part of the record on appeal. But even so, Brent's argument has no merit.

First, the trial court *agreed* with Brent that "Mr. Bowes also failed to provide any . . . type of detailed summary of the work or services he performed for the trust" and that his "work summary is woefully inadequate to justify full time employment by the trust for over thirteen years." For this reason alone, the court reduced almost by half the amount of compensation to Mr. Bowes from approximately $600,000 to $329,000.

Second, the trial court found that Mr. Bowes nevertheless was entitled to reasonable compensation because the Trust received "a substantial benefit" from his services. The record supports this finding. Mr. Bowes testified that he had worked for the original trustors before their deaths managing their real properties; after their deaths, he managed all aspects of the vacant lots owned by the Trust, including locating and selling the lots; he managed all aspects of the tenant-occupied properties of the Trust, including collecting rents, overseeing repairs, advertising, showings and walk-throughs, screening tenants, evicting tenants, dealing with squatters, vandalism, prostitutes and the police on multiple occasions, and addressing various violations; he organized the bills and prepared checks to be signed; he worked on tax issues, including an audit by the Internal Revenue Service; he assisted in litigation involving the Trust, including producing 5,000 pages of documents; and he spent substantial time communicating with Brent because there was a restraining order against Brent due to Brent's death threats against his sister Michelle. Mr. Bowes worked full time for the Trust, often more than 40 hours a week. He did not keep detailed time records because he received a salary based on $25 an hour. And he was not reimbursed for mileage, gas or insurance, or paid overtime.

Michelle testified that Mr. Bowes worked "massive hours"; that he assisted in organizing documents for taxes and managed the Trust properties; he prepared checks, went through the mail, and assisted with litigation; and he dealt with government agencies when illegal dumping occurred on the vacant lots. She believed that he was well qualified and more cost effective than a professional property manager, and that the

payments made to him were reasonable and in the best interest of the Trust. He was offered a salary instead of an hourly position to save the Trust money.

### B. Compensation Amount

Brent contends the trial court made mathematical errors in calculating the reasonable amount of compensation owed by the Trust to Mr. Bowes.

Noting that institutional trustees normally charge between 0.75 percent and 2 percent of the value of the assets being administered, the trial court determined that Mr. Bowes was entitled to compensation for administrative services at 1 percent of the assets that he administered. The court found that between 1999 and 2004, Mr. Bowes was administering assets "valued at approximately $2,000,000," and that between 2005 and 2011, the assets were "valued at approximately $700,000."

Brent complains that the second and third accountings show that the actual assets on hand were less than what the trial court stated, and he therefore argues that the amounts awarded based on the 1 percent calculations need to be reduced. As noted above, we do not consider the accountings to be before us. In any event, it appears that the trial court multiplied 1 percent against rounded approximations of the Trust's assets. We cannot conclude that such calculations exceeded the bounds of reason, especially when the trial court could have decided to use a higher multiplier than 1 percent.

Brent also complains that the trial court's various awards of additional fees to Mr. Bowes were miscalculated, unreasonable and unsupported. Specifically, he challenges the award of rental property management fees of $135,000, which the court calculated as $10,000 per year from October 1, 1999 (the date of Loretta's death), through December 31, 2011. According to Brent, this figure equates to approximately 50 percent of the gross rents for some years, as reflected by the annual rents stated in the three accountings, which he finds to be "highly excessive." But the trial court did not state that it was basing its award of property management fees on a percentage of gross profits. Rather, the trial court selected $10,000 per year as reasonable compensation because "Mr. Bowes was managing all the rental property in the trust." Contrary to Brent's assertion that "[l]ittle or no evidence was provided as to what work was actually

6

provided as [to] managing the rental property," both Mr. Bowes and Michelle testified to the substantial work Mr. Bowes performed managing the Trust's properties. Thus, we cannot find that the trial court's award of property management fees was arbitrary and capricious.

Brent also challenges the trial court's award of $10,000 to Mr. Bowes for managing the vacant properties owned by the Trust. In the amended statement of decision, the trial court referred to this work as "litigation" work regarding the properties. Brent points out there was no evidence of litigation regarding the vacant properties. But this description appears to be a typographical error. The trial court began its discussion by stating that "Mr. Bowes is also entitled to additional fees for the work that he was doing concerning the vacant and unimproved land that was owned by the trust." The preceding paragraph in the amended statement, however, dealt with a different amount of additional fees Mr. Bowes was entitled to "for the litigation work that he was doing for the trust." In any event, Brent acknowledges that $10,000 is a "small" amount. And the record supports an award of compensation for Mr. Bowes's work managing the vacant properties. Mr. Bowes and Michelle testified that he assisted with locating and selling the lots; dealt with contractors where structures needed to be removed; dealt with government agencies when there were code violations; and handled weed abatement. Again, Brent has not shown that this award was arbitrary and capricious.

### C. Overpayment of Compensation

Brent contends the trial court erred in refusing to hold the successor trustees personally liable for the difference between the amount of compensation actually paid to Mr. Bowes (approximately $600,000) and the amount the trial court found to be reasonable compensation ($329,000).

The trial court quoted the Trust at Article 12: "No Trustee shall be liable for acts or omissions in administering the trust estate or any trust created by this agreement, except for the Trustee's own actual fraud, gross negligence or willful misconduct." The court went on to find that the successor trustees "acted in good faith in administering this trust," and that "[t]here was no evidence that the co-trustees acted with fraud, gross

7

negligence or willful misconduct." Thus, the court determined that respondents were "not personally liable for any amount paid to Mr. Bowes in excess of $329,000" and that "the overpayment to Mr. Bowes would still be the responsibility of the trust."

While Brent argues that the failure of respondents to require Mr. Bowes to maintain adequate time records of the work he performed "must be considered gross negligence or willful misconduct," Brent does not challenge the trial court's express findings, repeated in the judgment, that respondents did not engage in fraud, gross negligence or willful misconduct. Thus, there is no merit to Brent's contention.

Moreover, the evidence before us supports the trial court's findings. Michelle testified that while she did not ask Mr. Bowes to maintain time records, he "kept [her] up to date on things," and that at one point she had more documentation of what he was doing, but her computer and bag were stolen from her car. She also testified that she would go over the mail and checks with Mr. Bowes, before she signed the checks, to "make sure that things were being done." Michelle and Mr. Bowes did not believe that detailed timesheets were necessary because he was being paid a salary. Michelle also testified that she did not ask for detailed timesheets because she was afraid Mr. Bowes would "start adding it up and wanting more money."

## IV. Attorney Fees

Brent contends the trial court abused its discretion in finding that the successor trustees' attorneys were entitled to their fees for defending a particular lawsuit. In 2003, one of the original beneficiaries, Timothy, died suddenly. In 2004, his widow Terri filed a petition to determine whether Timothy's share of the Trust should pass to her or to Timothy's son from a prior marriage, Timothy Jr. A different trial court ruled on Terri's petition and found against her. We affirmed this decision in an unpublished opinion (*Steuber v. Steuber* (Feb. 10, 2010, B213603) (Terri opinion)). Brent argues that Timothy, Jr., and not the Trust, should have been responsible for the attorney fees incurred in litigating his entitlement to his father's share of the Trust because the litigation had no other relation to the Trust and was of no benefit to any other beneficiaries.

8

Here, the trial court quoted from the Trust at Article 12, paragraph (j), which gives the trustees the right "To initiate or defend, at the expense of the trust estate, any litigation relating to this Agreement or any property of the trust estate which the Trustee considers advisable, and to pay, compromise, compound, adjust, submit to arbitration, sell or release any claims or demands of the trust estate or any trust created hereunder against others or of others against the same as the Trustee may deem advisable, . . . ." The court noted that respondents were sued by Terri "in their representative capacity as co-trustees."

The Trust is not before us. Neither is the petition filed by Terri. While Brent characterizes Terri's lawsuit as one solely between two potential beneficiaries fighting over Timothy's share of the Trust and which did not involve any other beneficiaries or aspects of the Trust, this was not the situation. Our Terri opinion[2] states Terri alleged that respondents unreasonably delayed in distributing the Trust's assets. Thus, Terri directly attacked the trustees' administration of the Trust assets, and it was therefore litigation involving the property of the Trust. Indeed, the Terri opinion focused entirely on respondents' authority to distribute the Trust assets and concluded that any delay in distribution was not unreasonable. Under the plain language of the Trust quoted above, respondents had the right to hire attorneys to defend Terri's allegations. Brent has not shown that the trial court's approval of the attorney fees was an abuse of discretion.

## V.  The Bennett Property

Finally, Brent challenges the trial court's finding that certain real property, referred to by the parties as the "Bennett property," had a fair market value of $56,798 when distributed to respondent Michelle.

Michelle testified that at some time prior to October 1999, she purchased the Bennett property with her parents, paying one-half the purchase price. A deed was supposed to be recorded at that time by attorneys with her name on it, but it did not get recorded until June 12, 2006. At some point, she took the Bennett property as a

---

[2]    On our own motion we take judicial notice of the Terri opinion. (Evid. Code, § 452, subd. (d).)

distribution to herself in lieu of monies owed to her by the Trust. At the time of distribution, she valued the Bennett property at $56,798. In October 2006, about three months after the deed was recorded, she obtained a loan on the Bennett Property for $715,000, which she testified was about the value of the Bennett property at that time.

Brent argues that "distribution of an asset with an admitted fair market value of over $700,000.00 for a charge of only $56,798.00 must be deemed self-dealing and should not have been approved by the court." But Brent points to nothing in the record that undermines the court's finding of the fair market value of the Bennett property at the time it was distributed to Michelle. Indeed, the trial court expressly found Michelle "to be credible concerning the events surrounding the distribution of the BENNETT PROPERTY." Accordingly, Brent has failed to show an abuse of discretion by the trial court.

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, Acting P. J.
　　　　　　　　ASHMANN-GERST


We concur:


_____, J.
　　　　CHAVEZ


_____, J.
　　　　HOFFSTADT


10